(C. D. 1470)

F. W. MYERS & CO., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided October 21, 1952)

*Barnes, Richardson & Colburn* (*Eugene F. Blauvelt* of counsel) for the plaintiff.
*Charles J. Wagner*, Acting Assistant Attorney General (*William J. Vitale* and *Richard H. Welsh*, special attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

RAO, Judge: An importation from Canada of culls and side runs of kraft wrapping paper was classified by the collector of customs as paper, not specially provided for, and assessed with duty at the rate of 30 per centum ad valorem, pursuant to paragraph 1409 of the Tariff Act of 1930. It is claimed in this action that the collector erroneously assessed duty against this importation, and that, by reason of mutilation and other considerations, the merchandise is properly free of duty as paper stock, within the provision therefor in paragraph 1750 of said act.

The pertinent portions of the Tariff Act of 1930 provide as follows:

PAR. 1409. * * * paper not specially provided for, 30 per centum ad valorem.

PAR. 1750. Rag pulp; paper stock, crude, of every description, including all grasses, fibers, rags, waste (including jute, hemp, and flax waste), shavings, clippings, old paper, rope ends, waste rope, and waste bagging, and all other waste not specially provided for, including old gunny cloth, and old gunny bags, used chiefly for paper making, and no longer suitable for bags.

It appears that the merchandise at bar was manufactured by the Brompton Pulp & Paper Co., Ltd., of Canada, consigned to F. W. Myers & Co., Inc., to be entered by it and thence to be transported to McIntyre Bros., Inc., of Fayetteville, N. Y., the ultimate consignee. Upon the invoice of the manufacturer appears the following:

"This shipment consists of rejected liner board and/or side rolls which have been perforated and are commercially unfit for uses other than repulping."

"This merchandise is sold and purchased only as woodpulp in its raw condition for further processing not for use in its present state as paper or paper board. This woodpulp is mutilated by perforations on centres not more than 12'' apart."

Winfield McIntyre, president of McIntyre Bros. Paper Co., the ultimate consignee herein, since its formation in 1914, called as a witness in behalf of plaintiff, testified that his company manufactures a type of kraft tissue paper, and that most of the importation was used as paper stock. He produced a sample from one of the unused rolls of the instant shipment which was received in evidence as plaintiff's exhibit 1. This sample, 48 inches in width, is perforated lengthwise, at four points across its width, the perforations being approximately ½ inch apart.

McIntyre stated that all of the rolls in the importation, 30 inches and wider, were perforated in the same manner as exhibit 1, and that the narrower rolls, although not perforated, showed indentations on the ends which indicated that they had been "cracked" or "whacked" with an ax, the purpose of such mutilation of the paper being to prevent its resale. Upon cross-examination, this witness admitted, however, that the only roll in the carload which he had inspected was that from which the sample, plaintiff's exhibit 1, was taken.

He further testified that he had purchased in the United States kraft culls and side runs of the same character as those involved in this case for 35 or 40 years, and that such paper was used as raw stock or pulp. He later qualified this statement by saying that he did not know if he used culls or side runs in 1930; that they were not available at that time, but he was using, as paper stock, waste kraft paper, such as envelope cuttings, and also old newspapers and ledger stock. In using this paper, the rolls are laid flat on the floor, and an electric power saw, such as carpenters use, is run across the roll, cutting it in widths of from ⅜ to ½ inch. When the rolls are sawed, a portion of the cuttings is thrown into a beater, containing water, and mixed with old tabulating cards, waste newspaper, and other old paper stock.

On the question of other uses of this material than as paper stock, McIntyre stated that he knew of no other use for perforated paper, but thought some market could be found for it.

Albert G. Durgin, superintendent of control for Brompton Pulp & Paper Co., Ltd., testified that his company manufactures kraft wrapping paper, bag paper, envelope paper, and other kraft specialties, and that he has charge of specifications for quality of these products, supervising rejects of material not up to the merchantable standards of the company. He had been with the Brompton people for 18 years. Prior to that, he was connected with a Canadian manufacturer of newsprint, and with a Canadian bank investigating the physical status of mills. He was "the first professor in the pulp and paper company established at the University of Maine in 1915,"

having previously worked for paper companies in Maine. He was also attached to the United States Bureau of Standards in charge of the paper section.

While this witness did not specifically examine the shipment at bar, he recalled it and the fact that it was made in the regular course of business. He stated that culls consist of any grade of kraft paper or kraft board not up to specifications, which is culled for shipment, and that side runs are trimmings resulting from instances where the sheet order is insufficient to cover the full width of the machine on which the paper is run. Certain quantities of the side runs are defibered and used by his company as raw material in the manufacture of paper. The portion not used by the manufacturer is stored for resale.

Durgin stated categorically that side run kraft paper and culls, such as represented by exhibit 1, were used as an extender to or a substitute for raw or virgin pulp in the manufacture of paper, as paper stock; and that this was true, to his belief, "so far back as the industry goes."

This witness further testified that perforations are put into cull sheets by a star wheel or slitter to render the paper unfit for use other than as pulp; that such mutilation prevents its being used as a commercial product; that papers like exhibit 1 were rejected by his mill because they did not meet the mill standards of commercial paper, either because they were of an uneven basis weight or low in Mullen test, but he could not tell, without a physical test or chemical analysis, in what respects exhibit 1 was substandard; that side runs could not be used for ordinary wrapping paper because they generally have a heavier weight than a sheet of 10-inch width is used for; that, moreover, they are hacked on the side so that they do not unroll; that there is no market for hacked side runs or perforated culls; and that the paper was intentionally perforated for shipment to the United States as paper stock.

In the opinion of the witness Durgin, articles such as exhibit 1 and side runs, in their condition as imported, could not be used as liners in packing boxes, because of the tendency to tear from all the holes and perforations. They had no use commercially as wrapping paper.

For the defendant, George R. Schirm, inspector for United States customs at Malone, N. Y., testified that he examined the carload of paper involved in this case. He stated that he climbed into the car, examined the rolls, and with the use of a knife cut two samples off the outside layers of two 9-inch rolls, which he found on either side of the open door of the car. These samples, which the witness produced, were received in evidence as defendant's collective exhibits A and B, over the objection of counsel for the plaintiff, who elicited

from the witness the fact that the rolls from which the samples were taken were 27 to 30 inches in diameter, 100 inches in circumference; that he tore off pieces longer than collective exhibits A and B, which are perhaps 18 inches long; that he did not know how many rolls were in the car.

He further stated that he examined about 20 to 25 per centum of the rolls in the car—the whole top layer of the car—and found no cutting or chopping of the rolls; that he looked for perforations because that is what the invoice called for, but did not see any perforations; that he could not tell whether there were fifty 48-inch rolls in the car; and that he could not obtain any samples of paper like exhibit 1, because of the way the car was loaded.

In rebuttal, plaintiff called Paul Tanguay, an employee of Brompton Pulp & Paper Co., Ltd., for over 20 years, presently foreman in the finishing room, supervising shipping. He stated that he remembered the shipment at bar; that it was a usual shipment as far as mutilation was concerned. The culls were perforated in the machine; the side runs were hacked. This witness identified a photograph which he stated represented some of the rolls of paper in the instant shipment. The photograph was received in evidence as plaintiff's exhibit 2. With respect to this exhibit, Tanguay testified that the lines which appear on the sides of the roll are made with an ax to prevent unwinding, and that the core of the roll has been hit with an ax to prevent its being placed on a shaft; that the ax marks are two lines across the roll, and that on a roll approximately 30 inches in diameter, the ax marks would be about 25 inches apart on the circumference and from an eighth to a quarter inch deep.

On the basis of this record, plaintiff contends that the entire carload of culls and side runs of kraft paper was unfit for any paper use, but was usable only as paper stock, and that whether multilated or not, it was of a class of paper which has always been used as paper stock.

The Government, on the other hand, urges that plaintiff has failed to show by satisfactory evidence that kraft paper culls and side runs were commonly and commercially used for paper making at and prior to the effective date of the Tariff Act of 1930.

The provision for paper stock appearing in paragraph 1750, *supra*, and in prior tariff statutes, has been the subject of several decisions of this and our appellate court. These cases consistently adhered to the proposition that the term "paper stock" is an *eo nomine* designation and refers only to such merchandise of the class or kind which was chiefly used for paper making at and prior to the passage of the tariff law under consideration. *Hawley & Letzerich et al.* v. *United States,* 19 C. C. P. A. (Customs) 47, T. D. 44893; *United States* v. *Belgam Corp. et al.,* 22 C. C. P. A. (Customs) 402, T. D. 47402; *National Sanitary Rag Co.* v. *United States,* 23 C. C. P. A. (Customs)

200, T. D. 48051; *United States* v. *William Steck & Co., Inc.* and *William Steck & Co., Inc.* v. *United States*, 28 C. C. P. A. (Customs) 187, C. A. D. 144; *Johns-Manville Corp.* v. *United States*, 62 Treas. Dec. 820, Abstract 21073.

It was, therefore, incumbent upon the plaintiff in this action to overcome the presumption inherent in the collector's classification of the merchandise at bar, to wit, that it was paper, not specially provided for, by proof that culls and side runs of kraft wrapping paper, in the condition of the material here involved, were, at and prior to June 17, 1930, chiefly used for paper making.

We think, after a careful review and analysis of the evidence before us, that plaintiff has sustained the burden which the statute and its judicial construction cast upon it. The record in this case sufficiently establishes that culls and side runs of kraft paper, because of imperfections in manufacture in the case of culls, and narrow width in the case of side runs, have no practical commercial utility as paper, and have served as a substitute for raw or virgin pulp in the manufacture of paper, "so far back as the industry goes." In this connection, we construe the foregoing statement of the witness Durgin to cover at least the period of his 35 years' experience in the paper industry, and to demonstrate such a use for this material as of the time of the enactment of the Tariff Act of 1930.

Moreover, so as to insure that such merchandise could not be resold in the United States for any use as paper *per se*, the manufacturer who found the culls substandard and the side runs too narrow to be useful at the weight which they carried, caused these rolls of paper to be mutilated. The culls were perforated by a slitting machine, as hereinabove described; the side runs were chopped with an ax. We do not consider that the testimony of the customs inspector is sufficient to controvert the convincing evidence of mutilation produced by the plaintiff. An analysis of his testimony reveals that he could not have made more than a very cursory inspection of the instant carload of paper. He made examination only of the top layer of rolls. He took no samples of culls, although the invoice plainly showed such items to be included in the importation. As to the side runs, it was entirely possible for him to have cut samples of those portions of the rolls which were not mutilated, in view of the lengths taken as compared with the spacing of the hack marks. That he did not see any mutilation under the circumstances of his examination of the shipment, by no means establishes that the rolls were not, in fact, mutilated.

Two highly qualified witnesses, one in the paper business in the United States for approximately 40 years, the other with a vast experience with the manufacture of paper, both in the United States and in Canada, could suggest no other use for this material than as paper

stock. Indeed, had another use for such merchandise been shown, it does not necessarily follow that the material at bar would suffer the loss of its character as paper stock, for the legal requirement is that it shall be of a class of material which is *chiefly*, not *solely*, used for paper making. *National Sanitary Rag Co.* v. *United States, supra.*

It is true, of course, that plaintiff's witness McIntyre did not know whether culls or side runs of kraft paper were available for use as paper stock in 1930. Nevertheless, he clearly recalled that other waste kraft paper such as trimmings or clippings derived from the manufacture of envelopes was then available for that purpose. Moreover, the witness Durgin was firmly of opinion that culls and side runs of kraft paper were always used as paper stock. As to the latter, we do not consider as materially minimizing the effect of his testimony the circumstance that since 1919 his business connections were largely, if not entirely, with Canadian firms, for the reason that it is fairly inferable that in and about the year 1930, he was engaged in producing newsprint for the American market. Furthermore, his wide experience in the paper field in the United States prior to 1919 would seem certainly to have qualified him to testify concerning the materials consumed in its manufacture. If side runs and culls of kraft paper were used in the United States for the making of paper in and prior to the year 1919, and also at some period subsequent to the year 1930, it is reasonable to assume, in the absence of evidence to the contrary, a continuity of use from 1919 to the date of the importation at bar.

Accordingly, and based solely upon the record made in this case, we hold that side runs and culls of kraft paper were, at and prior to June 17, 1930, a class or kind of merchandise chiefly used as material for paper making, and that the merchandise at bar, being culls and side runs of kraft paper, is free of duty as paper stock within the provisions of paragraph 1750 of the Tariff Act of 1930.

Judgment will be entered accordingly.